## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **No. 24-cr-00226 (BAH)** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMIEK BASSIL, et al** | : | |
| | : | |
| **Defendants.** | | |

## GOVERNMENT'S OMNIBUS MEMORANDUM
## IN SUPPORT OF PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this omnibus memorandum in support of its oral motion requesting pretrial detention of defendants Jamiek Bassil, Damien Jenkins, Trevon Palmer, Charles Manson, Van Robinson, Nathaniel Russell, Briyon Shuford, Lydell Douglas, Jerome Powell, and Jason Green, pursuant to 18 U.S.C. § 3142(f)(1)(C) (serious drug felony).[1]  With respect to defendant Bassil, the United States also requests pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(1)(D) (recidivism) and 3142(d)(1)(A)(iii) (on probation or parole).  As to defendant Jenkins, the United States also requests detention pursuant to 18 U.S.C. § 3142(f)(1)(E) (a felony involving a firearm).  As to defendant Green, the United States also seeks pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(D) (recidivism) and, with respect to Powell, pursuant to 18 U.S.C. § 3142(d)(1)(A)(i) (on release pending trial) and (f)(2)(A) (serious risk that he will flee).

In support of this motion, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.

---

[1]  As of the date of this filing, defendants Bassil, Russell, Shuford and Robinson are scheduled for a detention hearing on May 20, 2024 at 2:30.  Defendants Palmer, Jenkins, Douglas, Powell and Green are scheduled for a detention hearing on May 21, 2024 at 2:30.  Defendant Manson conceded detention at the initial appearance on May 16, 2024.

## BACKGROUND AND STATEMENT OF FACTS

### I.    Overview of the Investigation

In or around July 2023, the Metropolitan Police Department's Violent Crime Suppression Division ("VCSD"), along with the Drug Enforcement Agency ("DEA") and Federal Bureau of Investigation ("FBI"), began investigating sales of controlled substances and crimes of violence involving firearms in the area colloquially known as "21st and Maryland."  This refers to the area surrounding the intersection of 21st Street and Maryland Avenue NE, Washington, D.C., which consists mainly of low-rise apartments and row homes, and includes the 1900 block of I Street NE, Washington, D.C. (I Street NE is one block south of and parallel to Maryland Avenue NE.  19th Street NE is the next street to the west of and parallel to 21st Street NE.)

Through the investigation, law enforcement identified several members of a drug trafficking organization ("DTO"), or crew, including the defendants.  Members of the crew, some of whom identify the area they frequent as the "I Block" and themselves as part of a group known as "21st and Vietnam," have been responsible for the distribution of significant quantities of multiple types of narcotics, including crack cocaine, fentanyl, methamphetamine, phencyclidine ("PCP"), and n-n-dimethylpentylone ("boot").  As more fully detailed below, in a short span of approximately six months between November 2023 and April 2024, law enforcement conducted approximately fifty controlled purchases from members of this group, using both confidential informants ("CI") and undercover officers ("UC").  As also detailed below, law enforcement also obtained and executed numerous search warrants, analyzed financial and other records, and conducted extensive surveillance, both manual and electronic, which provided substantial evidence as to the members of the group and their operations.

Based on this evidence, on May 9, 2024, a federal grand jury sitting in the United States District Court for the District of Columbia returned a seventeen count indictment in the above-captioned matter, charging the following individuals in connection with their participation in a Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl and Cocaine Base within 1000 feet of a protected location, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(B)(vi), 841(b)(1)(C), 860(a) and 846: Jamiek Bassil, Damien Jenkins, Trevon Palmer, Charles Manson, Van Robinson, Nathaniel Russell, Briyon Shuford, Lydell Douglas, Jerome Powell, and Jason Green. As discussed in more detail below, based upon the aforementioned charges, defendants Bassil, Jenkins, and Palmer face a mandatory minimum sentence of 10 years and a maximum term of life imprisonment; defendants Manson, Robinson, Russell, and Shuford face a mandatory minimum of 5 years and a maximum term of 40 years; and defendants Douglas, Powell, and Green face a mandatory minimum of one year and a maximum term of 20 years. Defendants Bassil, Jenkins, Palmer, Manson, and Russell have each also been charged substantively with multiple counts of Distribution of 40 grams or more of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi), counts which carry a mandatory minimum of 5 years and a maximum term of 40 years, and Palmer has also been charged with Distribution of 50 grams or more of Methamphetamine, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii), which carries a mandatory minimum sentence of 10 years and a maximum term of life imprisonment.

## II.    Surveillance

During the course of the investigation, law enforcement identified an apartment building located at 1919 I Street NE, Washington, D.C., which was being used by members of the group as a "headquarters" for their drug operations. Specifically, members of the DTO sold drugs outside,

in the front and the rear, as well as the first-floor hallway of the apartment building on a near daily basis.  Law enforcement also learned that members of the group were taking drug customers into Apartment 101, an unleased, vacant apartment on the first floor, to conduct narcotics sales.

On October 25, 2023, law enforcement installed a pole camera with a view of the 1900 block of I Street NE, which captured multiple suspected narcotics transactions involving members of the crew throughout the course of the conspiracy.  Law enforcement was also given permission to access privately-owned closed circuit television cameras ("CCTV") with views of the 1900 block of I Street, which have also captured multiple suspected narcotics transactions.  As a result of the crew's use of 1919 I Street NE, and particularly their unauthorized use of Apartment 101 to sell narcotics, law enforcement was granted access to the building's cameras (and restored at least one camera that members of the group had spray painted in apparent hopes to conceal their drug dealing).  Law enforcement was also given authority to install covert cameras capable of audio/video recording in the first-floor hallway near the building's entrance, as well as within Apartment 101.  Resulting surveillance confirmed that the group had essentially "taken over" 1919 I Street, NE, to use for their drug sales and that they were using Apartment 101, without authorization, to package and distribute narcotics, as well as to store firearms.

## III.    Controlled Purchases and other Drug Trafficking

As noted above, between approximately November 2023 and April 2024, law enforcement conducted numerous controlled purchases – approximately fifty – of narcotics, specifically fentanyl, crack cocaine, n-n-dimethylpentylone, and methamphetamine, from the charged defendants during the course of the charged conspiracy.[2]  Some of the defendants, including Bassil,

---

[2]  Although final lab reports for most of the controlled purchases conducted during this investigation have been received, DEA has not yet provided final lab reports for all substances seized during the controlled buys.  Lab reports for suspected narcotics seized during controlled buys on February 28, 2024 (from BASSIL/RUSSELL), March 5,

Russell, Jenkins, Palmer and Manson, sold substantial quantities of narcotics on multiple occasions. And, as detailed below, the evidence related to the defendants' involvement in drug trafficking is not limited to the controlled purchases.

### A.    JAMIEK BASSIL (a.k.a. "Onion") and NATHANIEL RUSSELL (a.k.a. "Thump")

Defendant Bassil participated in approximately a dozen controlled purchases during the course of the investigation, distributing more than 400 grams of fentanyl in the area of 1919 I Street, NE and elsewhere. On a single occasion, Bassil directly delivered approximately 88 grams of fentanyl directly to an undercover officer ("UC"). Defendant Russell participated in four of these transactions, personally distributing approximately 260 grams of fentanyl directly to a UC.[3]

Although Bassil personally met with a UC alone on more than one occasion, he and Russell began working together to complete the sales. During four controlled purchases, which were arranged by Bassil with the UC, Russell met the UC to deliver the narcotics. For example, on February 21, 2024, a UC called Bassil to arrange a purchase of three ounces of fentanyl. Bassil agreed to meet in the area of the 2600 block of 14th Street, NW, Washington, D.C. After the UC arrived at the location, s/he called Bassil to advise that s/he had arrived. Bassil stated his "nephew" would be coming to conduct the transaction on his behalf. Shortly after, Russell approached the UC's vehicle and provided the UC with three plastic twists containing 82.97 grams of fentanyl in exchange for $2,520. A review of toll records revealed that Bassil's phone was in contact with

---

2024 (from JENKINS), March 5, 2024 (from MANSON), March 6, 2024 (from BASSIL), and March 14, 2024 (from BASSIL), showed that the substances purchased contained "no controlled substance." For two other controlled purchases, the final DEA results indicated that the substance was either methamphetamine or n-n-dimethylpentylone. In each instance, however, the buyer communicated or implied that they wished to purchase fentanyl.

[3] On February 28, 2024, during one of the controlled purchases involving Bassil and Russell in which the UC arranged to purchase fentanyl, Russell provided approximately 88 grams of a substance determined through DEA lab testing as not a controlled substance. Additional analysis of the substance is pending.

Russell's phone around the time of the controlled purchase on February 21, 2024. More specifically, toll records show that the UC called Bassil at approximately 8:54 a.m. to advise that s/he had arrived and Bassil then called Russell at approximately 9:00 a.m. and then again at approximately 9:00:30 a.m. Shortly after that phone call, Russell approached the UC's vehicle and conducted the transaction.

Similarly, on February 23, 2024, a UC again called Bassil to arrange a purchase of three ounces of fentanyl. Bassil agreed to the purchase, advising that the UC would be meeting with the same individual from the previous buy in the area of the 2600 block of 14th Street NW, Washington, D.C. The UC called Bassil at approximately 8:58 a.m. to advise that s/he had arrived. Tolls records show that directly after that call, Bassil called Russell. Shortly after that phone call, Russell was observed exiting 2622 University Place NW. Russell then walked to the buy location and entered the UC's vehicle, where Russell provided the UC with three plastic twists containing approximately 82.97 grams of fentanyl in exchange for $2,520 of MPD prerecorded funds.

On March 1, 2024, the UC again called Bassil to arrange a purchase of three ounces of fentanyl, and Bassil agreed to the purchase. At approximately 9:05 a.m., the UC called Bassil to advise that s/he would be arriving to the predetermined buy location shortly. Toll records show that Bassil subsequently had multiple calls with Russell. Shortly after, Russell was observed exiting 2622 University Place, NW and walking to the predetermined buy location. Once the UC's vehicle arrived, Russell entered the vehicle and provided the UC with three plastic twists containing approximately 82.9 grams of a white powder substance in exchange for $2,520 of MPD prerecorded funds.

In addition to the controlled buys, investigators amassed extensive other evidence of Bassil's drug trafficking. For example, on multiple occasions, surveillance footage showed him

engaged in apparent narcotics sales at the rear of 1919 I Street NE, as depicted in Figure A below (note the plastic bag with white substance in his left hand while he places in object in the hand of a suspected drug buyer):



*Figure A: Bassil engaged in narcotics sale (1919 I St NE – rear exterior)*

On March 9, 2024, defendants Bassil and Jenkins were in Apartment 101 discussing the preparation of narcotics for distribution.  Jenkins can be heard saying words to the effect of, "I need to put the shit together…mix 5 grams of this, 10 grams of this, and 15 grams..."  Bassil said, "You can kill someone with this, that's a charge."  Jenkins said, "You have to take 2 grams of fent, 5 grams of this and 10 grams of this…."  The two continued talking about mixing drugs with cutting agents.

Other lawfully obtained electronic communications similarly evidence Bassil's drug trafficking, as well as links between members of the conspiracy. For example, on September 12, 2023, defendant Manson (a.k.a. "Cheese") texted defendant Bassil to "Bring that outside 4 me". Bassil responded, "Tell woe [defendant Jenkins] both doors open I'm in here bagging up," an apparent reference to packaging narcotics as detailed in Figure B below:



***Figure B: September 2023 texts between Manson ("Cheese") and Bassil***

Similarly, on September 20, 2023, a drug customer begged defendant Bassil to front the customer "2 caps" because the customer was "dope sick." Defendant Bassil responded that he was not around and to wait until he got back, as depicted in Figure C:





*Figure C: September 2023 texts between Bassil and suspected narcotics user*

**B.    DAMIEN JENKINS (a.k.a "Woe") and BRIYON SHUFORD (a.k.a. "Breezy")**

Defendant Jenkins participated in approximately eighteen controlled purchases during the course of the investigation, distributing more than 400 grams of fentanyl in the area of 1919 I Street, NE.  Defendant Shuford drove Jenkins to one of these transactions in which – on a single occasion – Jenkins  directly delivered over 100 grams of fentanyl directly to a UC.

On or about March 29, 2024, a UC called Jenkins to arrange the purchase of three ounces of fentanyl.  Jenkins and the UC agreed on the price and to meet near 1919 I Street NE.  At approximately 11:45 a.m., the UC called to advise Jenkins that s/he had arrived.  Jenkins arrived shortly thereafter in his vehicle, which was being driven by Shuford.  Jenkins then went into 1919 I Street NE and another nearby apartment building before entering the UC vehicle, where he exchanged four plastic twists containing a total of approximately 115 grams of a powder substance, confirmed to be fentanyl by subsequent testing, in exchange for $900 of prerecorded funds.  During

the transaction occurred, law enforcement observed Shuford engaging in another apparent narcotics transaction to an unknown buyer from Jenkin's vehicle.

As with several other members of the group, both Jenkins and Shuford have been regularly observed engaged in suspected hand to hand sales of narcotics in and around 1919 I Street NE, as well as in the suspected preparation and packaging of narcotics within Apartment 101. In one such example, on February 26, 2024. Shuford was observed standing in the rear of 1919 I Street NE when an unknown male, a suspected narcotics buyer, approached Shuford and handed him a small item, believed to be currency. Shuford walked to the corner of the building, reached into the front of his pants and produced a clear plastic bag containing a white substance. Shuford opened the bag and manipulated items inside before handing the suspected buyer a small item, who accepted it and walked away.

On April 1, 2024, cameras captured Jenkins inside of Apartment 101 discussing the preparation of narcotics, specifically crack cocaine, for sale with Ahmed Bailey.[4] After appearing to gather supplies and place them on the kitchen counter, Jenkins is heard saying words to the effect of "…scale, scale, scale. This an ounce of coke. I'm gunna put 10 grams, I put 12 grams sometimes. Anything between 9 and 12 is cool…." Jenkins is later heard discussing the distinctive smell of crack cocaine. Similarly, on March 6, 2024, Shuford and Jenkins were observed entering Apartment 101, where Shuford donned a surgical mask and medical gloves before producing a clear plastic twist containing a white substance.

Other lawfully obtained electronic communications similarly evidence their involvement in drug trafficking and involvement in the conspiracy. For example, in a text thread between

---

[4] Defendant Ahmed Bailey has been charged by complaint in criminal case number 24-mj-178 and is currently set for a detention hearing on May 23, 2024.

10

Jenkins and Bassil, Bassil (a.k.a. "Onion"), Bassil appears to ask Jenkins for both "up" and "down" – consistent with street references to crack and fentanyl, as depicted in Figure D below:



*Figure D: December 2023 texts between Bassil and Jenkins*

Similarly, conversations between Shuford and Bassil discuss the distribution of narcotics, including Bassil's request for Shuford to bring him "down" – believed to be a reference to fentanyl – and to supply him with cut, or cutting agents used to prepare narcotics for distribution, as depicted in Figure E below:

| 06/05/2023 23:46:30 | (240) 302-6434 | Jamiek Bassil | Bring me a 3.5 down |
|---|---|---|---|
| 06/05/2023 23:46:36 | (240) 302-6434 | Jamiek Bassil | I'm 3 minutes away |
| 06/06/2023 22:55:00 | (202) 321-0668 | Briyon Dwayne Shuford | Yoooo |
| 06/07/2023 23:43:25 | (240) 302-6434 | Jamiek Bassil | Outback |



| Session | Date/Time | Sender ID | Sender Name | Message | Translation |
|---|---|---|---|---|---|
| 3007 | 06/14/2023 03:12:07 | (240) 302-6434 | Jamiek Bassil | Brodie bring me some cut outside tomorrow plz n thank you | |
| 3008 | 06/14/2023 07:58:48 | (202) 321-0668 | Briyon Dwayne Shuford | Bet | |
| 3009 | 06/14/2023 10:54:28 | (240) 302-6434 | Jamiek Bassil | Liked "Bet" | |

| Session | Date/Time | Sender ID | Sender Name | Message | Translation |
|---|---|---|---|---|---|
| 3010 | 06/14/2023 18:51:17 | (240) 302-6434 | Jamiek Bassil | Brodie plz tell me you brought the cut out for me if not can I meet you to get it when ever you got time it's no rush | |
| 3011 | 06/15/2023 13:09:39 | (240) 302-6434 | Jamiek Bassil | ♦ **⬛ Cash** attachments/0019948394.jpeg | |
| 3012 | 06/17/2023 11:24:40 | (240) 302-6434 | Jamiek Bassil | Brodie plz bring me some cut out today I really need it I can't do shit with this shit I got unless I get some an I honestly been looking high an low so I had to order it | |
| 3013 | 06/17/2023 11:25:15 | (240) 302-6434 | Jamiek Bassil | I know shit can be a headache sometimes when ppl keep asking for shit they should have but shod nigga I don't got it | |
| 3014 | 06/17/2023 11:25:17 | (240) 302-6434 | Jamiek Bassil | | |
| 3015 | 06/17/2023 11:46:49 | (202) 321-0668 | Briyon Dwayne Shuford | Liked "Brodie plz bring me some cut out today I really ne…" | |
| 3016 | 06/17/2023 11:47:06 | (202) 321-0668 | Briyon Dwayne Shuford | I got you brodie | |
| 3017 | 06/17/2023 12:29:26 | (240) 302-6434 | Jamiek Bassil | Loved "I got you brodie" | |
| 3018 | 06/17/2023 17:37:55 | (240) 302-6434 | Jamiek Bassil | ♦ **⬛ Cash** attachments/0019948394.jpeg | |

*Figure E: December 2023 texts between Bassil and Jenkins*

## C. TREVON PALMER (a.k.a. "Rock")

Defendant Palmer participated in approximately thirteen controlled purchases during the course of the investigation, distributing more than 400 grams of fentanyl in the area of 1919 I Street, NE and elsewhere. On a single occasion, Palmer directly delivered over 100 grams of fentanyl directly to UC. During one of the controlled purchases involving Palmer in which he

13

agreed to provide the UC with fentanyl, he actually provided the UC with approximately 80 grams of a substance that further testing confirmed as methamphetamine.

As with other members of the conspiracy, Palmer was regularly observed both in and around 1919 I Street NE engaging in hand to hand sales of narcotics to customers, as well as the preparation and packaging of narcotics for sale.  For example, on March 7, 2024, Palmer appears to be engaged in "cooking" crack inside of Apartment 101 as partially depicted in Figure F, a still shot from the recording, below:



*Figure F: March 7, 2024 still shot of Palmer inside Apartment 101*

Shortly thereafter, Jenkins enters and mentions "breaking the cookie," a reference to a stage in the process of preparing crack cocaine.  Bailey later enters and Palmer makes a reference to "…my ounce."

Additional conversations between Palmer and Robinson (a.k.a. "Boogie") similarly appear to refer to narcotics, specifically "cappos" – believed to be fentanyl capsules, which were sold by members of the conspiracy during the course of the investigation – as depicted in Figure G below:



*Figure G: January 2024 text thread between Palmer and Robinson*

### D.    VAN ROBINSON (a.k.a. "Boogie")

Defendant Robinson participated in approximately eight controlled purchases during the course of the investigation, distributing both crack and fentanyl in the area of 1919 I Street, NE. Additional evidence suggests that he was not only involved in the distribution of narcotics but may

actually have been helping to supply some of his co-conspirators.

As depicted in Figure G above, Palmer appears to have asked Robinson to supply him with "cappos" – believed to be fentanyl capsules, which is consistent with the type of narcotics purchased during controlled buys in this case. Significantly, it is also consistent with surveillance depicting Robinson engaged in suspected hand to hand sales of narcotics, as depicted in Figure H below:





***Figure H: February 26, 2024 surveillance of Robinson at 1919 I Street NE***

Other evidence also indicates that Robinson was supplying others, including Palmer, with narcotics. As depicted in Figure I below, on February 5, 2024, Palmer texts Robinson, "you got something for me" and Robinson appears to agree to sell Palmer an "8th" for $2500, which would be consistent with the price of 125 grams – or an 1/8 of a kilogram – of fentanyl. Robinson then attaches an image of a scale showing a digital weight of 125.1.









*Figure 1: February 5, 2024 texts between Palmer and Robinson*

### E.    LYDELL DOUGLAS, JEROME POWELL, and JASON GREEN

Defendant Douglas was involved in approximately four controlled purchases throughout the course of the conspiracy, including one involving the same type of fentanyl capsules linked to his co-conspirators and another in which Jenkins provided a confidential informant ("CI") with suspected PCP on Douglas's behalf.  Both Powell and Green were each directly involved in one controlled purchase of narcotics during the investigation.

As with most of their co-conspirators, however, the evidence of their involvement in

narcotics trafficking is not limited to only controlled purchases.

For example, Douglas, Powell and Green were observed on a near-daily basis in and around 1919 I Street NE during the course of the conspiracy, including while engaged in suspected hand to hand sales of narcotics.  One such interaction involving Douglas is depicted in Figure J below:



*Figure J: March 1, 2024 narcotics sale by Douglas inside 1919 I Street NE*

Similarly, on March 25, 2024, Green was observed standing in the rear of 1919 I Street, NE, where surveillance captured him engaging in a suspected hand to hand transaction in which a suspected narcotics buyer approached Green and handed him a small item, believed to be currency. Green then walked to the corner of the building, reached into the front of his pants, and produced a clear plastic bag containing a white substance before handing the suspected buyer a small item, who accepted it and then walked away.

Even more troubling, both Powell and Green have routinely been seen with firearms inside of Apartment 101, used by members of the conspiracy as a trap house to prepare narcotics, which are known to be used by drug traffickers to protect their product and currency. For example, on February 20, 2024, Green was observed with a black rifle, brought into Apartment 101 by another known member of the group, which Green then placed into a duffel bag before leaving the building. Similarly, on April 23, 2024, Jenkins and Powell were observed entering Apartment 101, where Jenkins removed a firearm from his waistband before handing it to Powell, who then put the firearm into the front of his waistband.



*Figure K: Jenkins and Powell inside Apartment 101*

## IV.    Search Warrants

On May 15, 2021, law enforcement executed multiple search warrants to residences linked to members of the conspiracy, seizing nineteen firearms and multiple quantities of suspected narcotics. A chart detailing the seizures is set forth below:

| ADDRESS | ASSOCIATIONS and/or DEFENDANTS PRESENT | EVIDENCE SEIZED |
|---|---|---|
| 2622 University Place NW Unit | Jamiek Bassil / Nathaniel Russell (neither present at time | • Money counter<br>• Razor blade w/white residue |

| 203 WDC | of execution) | • Drug packaging materials |
|---|---|---|
| 503 Hilltop Terrace SE WDC | Damien Jenkins (who acknowledged the contraband was his) and one female were present | • AK-pattern pistol, 7.62mm, AK magazine, and one 7.62mm round<br>• .380 Ruger<br>• More than $3,000 in currency<br>• .40 caliber and 9mm rounds<br>• .22 handgun<br>• Razor blade with suspected cocaine residue<br>• Scale with suspected cocaine residue<br>• Bottle of cutting agent |
| 4233 Blaine St NE Unit 202 | Trevon Palmer (not on scene); at least one person was on scene | • $2,600 in U.S. currency<br>• Palmer's ID<br>• Two extended magazines<br>• Nothing found in two other residences associated with him, except a firearm lawfully registered to someone else |
| 1919 I St NE Apt 002 | Charles Manson and one female were present | • Glock 17 (stolen)<br>• 31-round magazine and ammunition<br>• Drug paraphernalia |
| 4616 Reed Terrace SE | Van Robinson (who said there was a gun present); five others were also present (including two juveniles) | • Glock 27<br>• 14 grams (with packaging) of suspected fentanyl<br>• Drug paraphernalia |
| 1401 Fairmont St NW Unit 508 | Nathaniel Russell was present; another individual, Calvin Allen, was present and arrested; three others were also present | • 147 grams (with packaging) of suspected cocaine found in pants appearing to belong to Allen that were inside a hamper; a Smith & Wesson was also found in he hamper<br>• Scale with white residue<br>• Two bottles of Promethazine |
| 612 Eastern Ave NE Unit 102 | Briyon Shuford was present | • More than $12,000 in U.S. currency<br>• Loaded Glock 30 under bed<br>• Drug paraphernalia |
| 84 Galveston St SW Unit 101 | Lydell Douglas was not present initially but showed up; a female and a juvenile were present | • 22 rounds of .40 caliber ammo<br>• Drug paraphernalia<br>• More than 50 grams (with packaging) of white powder suspected to be cocaine<br>• 3 vials containing suspected PCP<br>• Vial of suspected PCP from Douglas's person<br>• Vial of suspected PCP from vehicle |

|  |  | • 8 grams of suspected meth and fentanyl from his vehicle<br>• Bag of suspected cocaine from his vehicle<br>• 24.8 grams (with packaging) of suspected cocaine from his vehicle |
|---|---|---|
| 1919 I St NE Apt 101 | Jerome Powell was present | • Half ounce (with packaging) of suspected fentanyl<br>• Drug paraphernalia |
| 412 Tennessee Ave NE Unit 1 | Jason Green and one other person were present | • 8 guns, including 1 stolen<br>• |

## V.    March 7, 2024, Shooting

In addition to the drug charges, defendants Manson and Jenkins have been charged in connection with a shooting that occurred on March 7, 2024. That morning, Manson fired a handgun at an individual who was standing across the street from 1919 I Street NE. The shooting was captured on video surveillance video, which showed the victim of the shooting, who was not hit, verbally interacting with some members of the DTO who were in front of 1919 I Street NE. Manson walked toward the victim from the front of 1919 I Street before returning to the building. A camera inside of 1919 I Street captured audio from around this time, and someone can be heard saying words to the effect of, "he trying to get whooped or shot," in apparent reference to the victim. A person can also be heard asking words to the effect of, "you got a mask on you?" and another person replying, "nah." Immediately after, cameras inside of 1919 I Street, NE captured Manson going into Apartment 101. While inside the apartment, Manson put a gun on the couch and removed his jacket. Jenkins (dressed in black) followed Manson (in a white shirt and gray pants) inside and handed Manson a ski mask, as depicted below:



Defendant Jenkins was observed wearing the same clothing other times that day:



Defendant Manson put on the ski mask and his jacket, picked up the gun, and walked out of the apartment:



While defendants Manson and Jenkins were in the apartment, a person can be heard urging someone—apparently the victim—to leave the area.

Defendant Manson left 1919 I Street, NE, through the rear of the building as Defendant Robinson looked on:



He then rounded the corner and fired the handgun numerous times; cameras inside of 1919 I Street, NE, capture the sounds of the gunshots:



Defendant Manson re-entered 1919 I Street, NE, through the rear. The jacket he had on at that time, which includes a white triangle on the left sleeve (in the picture below left) matches the one he was wearing less than an hour before the shooting when he entered through that same door (in the picture below right):



As a result, Defendant Manson and Defendant Jenkins were charged with Assault with a Dangerous Weapon and Aiding and Abetting, in violation of 22 D.C. Code §§ 402, 1805. Defendant Manson was also charged with Unlawful Possession of a Firearm by a Felon, in violation of 18 U.SC. § 922(g)(1) and Possession of a Firearm During a Crime of Violence, in violation of 22 D.C. Code § 4504(b) (which carries a five-year mandatory minimum penalty).

## APPLICABLE LAW

The Bail Reform Act requires pretrial detention where a court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. §§ 3142(e).  Here, the defendants are charged with offenses for which a maximum term of imprisonment of ten years or more is prescribed under the Controlled Substances Act (21 U.S.C. 801 *et seq*.).  As a result, pursuant to 18 U.S.C. §§ 3142(e)(3)(A), there exists a rebuttable presumption that no conditions or combinations of conditions can effectively ensure all defendants' appearance in this case and otherwise protect the community.  The government must establish by clear and convincing

evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988)). For a detention decision based upon risk of flight, the government only need prove by a preponderance of the evidence that there are no conditions or combinations of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986). At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

In considering whether there are conditions of release which will reasonably assure the safety of any other person and the community and the appearance of the defendant as required, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. 3142(g). In consideration of these factors, along with the applicable rebuttable presumption, the United States respectfully submits that there is no condition, or combination of conditions, that would assure the safety of the community or the defendants' appearance (with respect to Powell) at future proceedings.

## ARGUMENT

### I.      Nature and circumstances of the Offenses Charged

The United States respectfully submits that the nature and circumstances of the charged offenses weigh in favor of detention. The defendants engaged in a significant drug trafficking conspiracy that trafficked copious amounts of fentanyl and other drugs. Their conduct occurred against the backdrop of a widespread, lethal drug epidemic. At this point in the opioid epidemic, it is common knowledge that fentanyl kills. Indeed, during the May 9, 2024 conversation between Bassil and Jenkins detailed above, it is clear *they also know* it kills. According to the DEA,

"fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage."[5]  As the DEA's recent "One Pill Can Kill Campaign" highlights, DEA laboratory testing indicates that that seven out of ten fentanyl-laced fake prescription pills seized by the DEA contain a potentially lethal dose of fentanyl.[6]  The lethality of fentanyl is reflected in nationwide statistics: roughly 106,539 people in this country died of drug overdoses in the 12-month period ending in May 2023.  *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of October 1, 2023).[7]  Of these deaths, roughly 73,765 (or about 69 percent) involved synthetic opioids.  *Id.*  By comparison, in 2021, 48,830 people in the United States died of firearms.  *See* JHU Bloomberg School of Public Health, *New Report Highlights U.S. 2021 Gun-Related Deaths: For Second Straight Year, U.S. Firearm Fatalities Reached Record Highs* (June 6, 2023).[8]  And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2021, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—second among all the states and the District of Columbia only to West Virginia.  *See* KFF, *Opioid Overdose Death Rates and*

---

[5] https://www.dea.gov/resources/facts-about-fentanyl

[6] https://www.dea.gov/onepill

[7] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm

[8] https://publichealth.jhu.edu/2023/new-report-highlights-us-2021-gun-related-deaths-for-second-straight-year-us-firearm-fatalities-reached-record-highs

*All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2021 timeframe).[9]

Of course, the lethality of fentanyl does not negate the danger of other drugs trafficked in this conspiracy. Cocaine can cause serious mental effects, including paranoia and depression, and serious physical effects, including cardiac arrest, strokes, and death. *See* DEA, Drug Fact Sheet: Cocaine (October 2022).[10]

And if all of this were not bad enough, this conspiracy involved gun violence and the recovery of well over a dozen firearms. Even "mere" possession of a firearm is dangerous. *Compare United States v. Blackson*, 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023) (noting, in the context of an individual who was found with a firearm on his person, that "illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community"). As the Court is well aware, our community has recently faced staggering levels of gun violence. D.C. saw 274 homicides in 2023, the highest in more than two decades. *See* MPD, *District Crime Data at a Glance*.[11] About 84 percent of the 203 homicides in 2022 involved the use of a firearm. *See* MPD, *Annual Report 2022*, 17.[12] But possessing firearms during or in connection with drug trafficking offenses poses increased danger in light of the extent to which drug trafficking can trigger violence. *Compare Smith v. United States*, 508 U.S. 223, 240 (1993) (noting that "drugs and guns are a dangerous combination").

---

[9] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Opioid%20Overdose%20Death%20Rate%20(Age-Adjusted)%22,%22sort%22:%22desc%22%7D.

[10] https://www.dea.gov/sites/default/files/2023-03/Cocaine%202022%20Drug%20Fact%20Sheet.pdf.

[11] https://mpdc.dc.gov/page/district-crime-data-glance (last visited May 18, 2024).

[12] https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR_2022_lowres.pdf.

Each of the defendants chose to engage in a criminal scheme rife with lethal drugs and firearms.  Such conduct, though all too common and too often ignored by some segments of society, poses grave risks to our community—especially its most vulnerable members—through violence, drug abuse, overdose, and a collapsing quality of life.  The nature of these offenses weighs heavily in favor of pretrial detention.

## II.   Weight of the Evidence Against the Defendants

The United States respectfully submits that the weight of the evidence against the defendants also weighs in favor of detention.  As detailed above, the charges are the result of a lengthy law enforcement investigation involving the use of undercover officers, surveillance (electronic and physical), and evidence generated as the result of multiple search warrants.  Even setting aside each of the defendants' involvement in one or more controlled purchases, which were audio and video recorded, substantial additional evidence exists as to the defendants' involvement in a conspiracy to distribute narcotics, including financial records, toll records, and the iCloud and text messages detailed above.

Moreover, as set forth in detail above, extensive surveillance – both from inside and outside of 1919 I Street NE – further substantiates the defendants' narcotics trafficking (as well as their involvement in firearms-related offenses).  This includes video of the defendants engaged in narcotics trafficking inside and outside of 1919 I Street NE, as well as audio and video surveillance of the defendants engaged in the preparation and packaging of narcotics for sale inside of Apartment 101.  With respect to Jenkins and Manson, this surveillance captures the details of the March 7, 2024 shooting – including their interactions with the victim, Jenkins's provision of a mask to Manson, and Manson opening fire on the victim across a street during broad daylight.

Additionally, as noted above, law enforcement executed numerous search warrants at the

time of the defendants' arrests on May 15, 2024. These warrants resulted in yet more evidence, including multiple types and quantities of narcotics, indicia of narcotics distribution, and twenty firearms – evidence which only further substantiates the defendants' involvement in the drug conspiracy.

### III.    History and Characteristics of the Defendants

The defendants' history and characteristics, addressed in turn, also weigh in favor of detention.

### A.    JAMIEK BASSIL

Defendant Bassil, who faces a mandatory minimum ten year sentence in this case, has 13 prior arrests, 3 convictions, one executed bench warrant, and a history of non-compliance on supervision. In short, Bassil has a troubling criminal history in which he has been convicted of ever more serious crimes. In 2011, he was convicted of Attempted Threats to do Bodily Harm in D.C. Superior Court. While he was on pretrial release in that case, he was found near 19th and I Streets, NE, with more than 100 zips of suspected cocaine and cash on his person. In a car that he and others were standing next to, and which was registered to Defendant Bassil's mother, was a firearm. As a result of this arrest, he was convicted in 2013 in D.C. Superior Court of PWID Cocaine, Possession of a Firearm During a Crime of Violence or Other Dangerous Offense, and Carrying Pistol Without a License.

Defendant Bassil was released from custody in 2015, and in 2017, while he *was still on supervision*, he was arrested yet again for numerous, still more disturbing, offenses. This time, according to the proffer of facts with which he agreed as part of his plea, he and two others were driving when they encountered the victim. One of the individuals with Bassil got out of the car and pointed an assault rifle at the victim; when the victim fought back, he was shot. Bassil and

the third person approached the victim with firearms or imitation firearms and the shooter stole the victim's car while the other two fled.  Bassil was ultimately convicted of Armed Robbery and Felon in Possession.

Notably, Bassil was released from custody for his latest conviction in October 2022 and is still on supervision.  He has, however, continued to reoffend by being involved in a significant and violent drug trafficking conspiracy.  His pattern of criminal activity shows that he is a danger, and his continued willingness to reoffend while on release shows that he would be unable or unwilling to comply with any release conditions imposed by this Court.

### B.    NATHANIEL RUSSELL

Ddefendant Russell, who faces a mandatory minimum of five years, has no prior convictions but a very troubling arrest history, particularly given his young age.  First, he was arrested in 2023 after police searched him and found a gun on his person.  He was not, however, prosecuted for this offense.  On May 9, 2024, Russell was observed with approximately 14-19 other people gathered around two cars when police saw him bend over behind a parked car.  Officers heard what sounded like a metal object sliding across concrete and then found one gun where Russell was bending over and another gun several feet away.  One of the vehicles was searched, and police found a 50-round drum mag and drugs.

Despite the fact that he has no prior convictions, the Court should be very concerned about the risk that Russell poses to the community, given his links to both firearms and significant narcotics trafficking.  Russell is personally responsible for the distribution of a significant amount of fentanyl – nearly 300 grams.  It should also be noted that a firearm, as well as a significant amount of suspected crack and Promethazine, were recovered from the residence where Russell was staying.  Although another resident was also arrested and charged for possession of those

items, Russell likely also had access to those items. In short, it is clear that Russell's involvement in criminal activity is not limited to this conspiracy, and his involvement in a significant number of drug sales is no aberration. Notwithstanding the lack of criminal history, it is concerning that his prior brushes with the law – being stopped with a firearm on his person in 2023, as well as the very recent events of May 9, 2024 – have seemingly had no deterrent or modifying effect on his behavior, given that he was arrested in a residence in which a gun and drugs were found.

### C.    DAMIEN JENKINS

Defendant Jenkins, who faces a mandatory minimum of ten years, also has a lengthy criminal history involving 10 prior arrests and 5 convictions. His two most recent convictions—both in 2020—were for misdemeanor drug possession. However, a closer review of the underlying arrest paperwork for 2019-CMD-1127 suggests that Jenkins in fact possessed drugs with the intent to distribute them. According to that paperwork, Jenkins lost his shoe while fleeing from police and inside the shoe was approximately 20 grams (with packaging) of cocaine. Jenkins was also found to be in possession of car keys; a search of that car revealed approximately 14 grams (with packaging) of cocaine base. Both of these amounts are more consistent with possession with intent to distribute than possession for personal use.

But drug offenses are not the only ones for which Jenkins has been convicted. He was convicted in 2012 of Robbery and Felon in Possession after he robbed someone at gunpoint and took their iPad. He was also convicted in 2009 of felony gun possession in Maryland. Thus, Defendant Jenkins's charges for drug trafficking and his involvement in a shooting are also not an aberration. Even more troubling is the evidence recovered from Jenkins's residence at the time of his arrest on May 15, 2024, as detailed below:

- AK-pattern pistol, 7.62mm, AK magazine, and one 7.62mm round

34

- .380 Ruger
- More than $3,000 in currency
- .40 caliber and 9mm rounds
- .22 handgun
- Razor blade with suspected cocaine residue
- Scale with suspected cocaine residue
- Bottle of cutting agent

### D.    TREVON PALMER

Defendant Palmer, who also faces a mandatory minimum of ten years, has 20 prior arrests and 4 prior convictions, including for drugs and firearms.  Most significantly, in 2020, he was convicted in Maryland of unlawfully transporting firearms.   In 2022, he was convicted of Attempted Possession with Intent to Distribute Marijuana and Attempted Possession of Cocaine. His probation for the latter offense did not end until November 2023, after he joined the drug conspiracy in this case and sold a significant quantity of a potentially fatal substance to members of our community.  Thus, he is likely to be unable or unwilling to follow any conditions the Court may impose.

As noted above, Palmer was personally involved in and responsible for the distribution of significant quantities of fentanyl directly to a UC (in addition to methamphetamine).  Although he was not present at his residence when the search was executed, law enforcement recovered $2,600 in U.S. currency, his identification, and two extended magazines.  His prior (and recent) firearms and narcotics related convictions, as well as his conduct in this case, indicate that he has not yet been deterred, and is unlikely to be deterred, from engaging in the same types of criminal conduct, and he is unlikely to be deterred by any conditions this Court could impose, should this Court release him.

### E.      VAN ROBINSON

At 42 years old, defendant Robinson has 26 prior arrests, 10 prior convictions, 6 bench warrants, as well as a pattern of non-compliance on release.  Most relevant here, he was convicted in 2006 of Possession with Intent to Distribute Cocaine and misdemeanor Possession of Marijuana. His probation in that case was revoked in 2016.  Similarly, he was convicted in 2012 of contempt for violating a stay away order.  Despite the fact that he has three children according to the Pretrial Services Report, he has continued to associate with a violent drug conspiracy and stood by while one of his co-defendants shot a firearm in broad daylight on a busy street on March 7, 2024. His long history of not following the law or supervision conditions suggests he will continue to reoffend if placed on pretrial release and will not follow conditions imposed by the Court.

Moreover, during a search of Robinson's residence on May 15, 2024, law enforcement also recovered a Glock 27, 14 grams (with packaging) of suspected fentanyl, and drug paraphernalia. Although other individuals, including juveniles, were present in the residence, Robinson advised law enforcement that the firearm was present.

### F.      BRIYON SHUFORD

Defendant Shuford, who also faces a mandatory minimum sentence of five years for trafficking a deadly drug, has 9 prior arrests, 2 convictions, and a pending case.  Troublingly, Shuford, who was convicted in 2016 of Assault on a Police Officer and has been an integral part of a violent drug conspiracy known to possess firearms, is employed by Ward 5 Violence Prevention Network, according to the Pretrial Services Report.  According to arrest paperwork for the 2016 conviction, Shuford was in the area of 20th and I Streets, NE, when he and others set off fireworks, specifically roman candles.  Shuford fired one round of the roman candle at an MPD officer.  He then claimed he was drunk and did not mean to do it, but also told the officer words to

the effect of, "don't let me see you out here no more." In 2019, he was convicted of misdemeanor domestic violence Destruction of Property after he allegedly kicked in the door of a house and he has a pending case in Virginia state case for trespassing.

More troubling is the evidence related to Shuford's possession of firearms. For example, evidence obtained from Shuford's iCloud account revealed videos and photographs depicting him with firearms. For example, multiple photographs dated on or about October 26, 2023, appear to depict him holding four distinct firearms, as seen below:



Significantly, metadata associated with the photographs indicates that the photographs were taken from within or right next to 612 Eastern Avenue, NE, Washington, D.C., where law enforcement executed a search warrant on May 15, 2024. As a result of that warrant, law enforcement recovered more than $12,000, drug paraphernalia, and a loaded Glock 30.

## G.    LYDELL DOUGLAS

Like most of the other defendants in this case, Douglas has an extensive criminal record. In 2006, he was convicted of Carrying a Pistol Without a License and he was also convicted of

contempt that same year.  In 2010, he was convicted of DUI.  In 2014, he was convicted of misdemeanor possession; the facts of that case, however, suggest that Douglas was actually engaged in distributing narcotics.  Specifically, after a law enforcement source observed him engaged in an apparent drug sale, he was searched and found to be in possession of cocaine and $258 in currency.  Put simply, Douglas has a long history of both drug and gun convictions, which underscore his dangerousness, and his contempt conviction further demonstrates that it is unlikely he will follow any conditions of release the Court may set.

The evidence recovered from his residence, vehicle and person on May 15, 2024, further highlight his dangerousness, given the sheer types and quantities of suspected narcotics at issue, as detailed below:

- 22 rounds of .40 caliber ammo
- Drug paraphernalia
- More than 50 grams (with packaging) of white powder suspected to be cocaine
- 3 vials containing suspected PCP
- Vial of suspected PCP from Douglas's person
- Vial of suspected PCP from vehicle
- 8 grams of suspected meth and fentanyl from his vehicle
- Bag of suspected cocaine from his vehicle
- 24.8 grams (with packaging) of suspected cocaine from his vehicle

### H.    JEROME POWELL

Defendant Powell has 21 prior arrests, 4 prior convictions, 12 prior bench warrants, one pending case, and a troubling history of non-compliance on supervision.  Indeed, Powell appears to be in Criminal History Category IV based entirely on contempt convictions.  On March 29, 2021, he was arrested for violating a protection order taken out against him by his ex-girlfriend.  On July 29, 2021, Powell was again arrested for violating the protection order when he allegedly again showed up at her residence, yelled, and threw something at her window.  On October 2, 2021, he was arrested for showing up at her residence yet again.  He also allegedly sexually

assaulted the victim by touching her and exposed his penis in front of her and their 5-year-old child (although he denied engaging in this conduct). On February 18, 2022, Powell was arrested for violating a *different* protection order taken out against him by a family member after he showed up at a family member's house. The allegation in the request for that protection order alleged that Defendant Powell hit the petitioner in the head with a brick. For each of these incidents, Powell was convicted of contempt.

In addition to these convictions, Powell has a dozen bench warrants, ten of which were executed and two of which were quashed. The extent and nature of the prior convictions and bench warrants indicate both that he is unable or unwilling to abide by any conditions the Court may impose, and also that he poses a substantial risk of simply not returning to Court should he be released.

## I.    JASON GREEN

At 47, defendant Green, who has 11 prior arrests, 5 prior convictions, 3 bench warrants and a pattern of non-compliance on supervision, is still engaging in criminal activity after his five prior criminal convictions, all of which involve drugs, guns, or both. He was convicted in 1995 of Attempted PWID Cocaine and Carrying a Pistol Without a License. He was arrested in 1997 for dealing in firearms and, while that case was still pending, was arrested in 2001 of a drug charge and Unlawful Possession of a Firearm by a Felon. He was charged federally in each case, and he was convicted in 2002 and 2007, respectively. In the interim, he was arrested in Maryland for PWID and D.C. for Distribution of Cocaine. He was convicted in those cases in 2007 and 2006, respectively. The fact that many of those crimes were committed while he was on pretrial release or while another case was otherwise pending shows that he would not follow any conditions of release imposed by the Court.

Green's 30-year criminal history involving drugs and firearms demonstrate that he would be a danger to the community if released.  Setting even that aside, however, law enforcement recovered *eight* firearms – including one stolen – from Green's residence, where he was present, on May 15, 2024.

## IV.   Danger to the Community

The United States respectfully submits that the defendants pose a significant danger to the community.  The presumption under § 3142(e)(3)(A) establishes that narcotics trafficking is an "inherently dangerous activity."  *See United States v. Bethea*, 763 F. Supp. 2d 50, 54 (D.D.C. 2011) (Lamberth, J.).  The United States respectfully submits that where, as here, the narcotics trafficking activity involved fentanyl, that danger is even more significant and magnified.  As the Court is aware, the entire nation is in the midst of an overdose epidemic, due in part to the synthetic opioid fentanyl.  Moreover, the defendants engaged in selling fentanyl while Washington DC *itself* is in the midst of such an epidemic.[13]  On November 13, 2023, the City's Mayor issued an executive order to address overdose "hot spots."[14]

Moreover, these defendants engaged in the distribution of *significant quantities* of fentanyl, as well as multiple types of other narcotics, including "boot," methamphetamine, PCP, and crack.  And they did so as part of violent drug conspiracy – a group who possessed multiple firearms, attempted to take over an apartment building in which children lived for their operations, and engaged in a shooting in broad daylight.  Put simply, the danger posed by these defendants cannot

---

[13] Deaths due to fentanyl in the District of Columbia outnumbered homicides during 2022: Howard University Hospital reports that the District has close to 400 opioid related deaths per year, and the Metropolitan Police Department has reported that there were 203 homicides in the District during 2022.

[14] Washington Post, "Under pressure to do more, Bowser declares public emergency on opioids," (November 13, 2023) ("Opioid overdose deaths recorded by the city so far this year are on pace to surpass last year's record of 461.")

be understated.

## CONCLUSION

For the reasons noted above, the government respectfully submits that no condition or combination of conditions will reasonably assure the appearance of the defendants as required, nor the safety of the community in this case.  Accordingly, the government respectfully requests that the Court grant the government's motion to detain the defendant pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:  _____/s/
SOLOMON EPPEL
D.C. Bar No.  XX
ANDREA DUVALL
AR Bar No. 2013114
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
202-252-XXXX (Eppel)
202-252-7277 (Duvall)
solomon.eppel@usdoj.gov
andrea.duvall@usdoj.gov

41